**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**COMMERCIAL INVESTMENT AND DEVELOPMENT CORPORATION OF FLORIDA, and Al L. Lee, Defendants.**

**No. 72–1027–Civ–JLK.**

United States District Court,
S. D. Florida,
Miami Division.

March 21, 1974.

Michael Stewart, Miami, Fla., for plaintiff.

Paul & Thomson, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

This cause came on for trial before the court without a jury. It is an action, brought by the Securities and Exchange Commission, in which it complains that the defendants, Al L. Lee and Commercial Investment and Development Corporation, violated the registration and anti-fraud provisions of the Securities Act of 1933 in connection with the public offering of stock of the corporate defendant. The SEC seeks a permanent injunction against future violations of the Securities Act. The court, having considered the record together with the well-prepared briefs of all counsel, enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Through membership in the same boating club in Fort Lauderdale, Florida, the defendant, Al L. Lee met William Kerver, Vice-President of Miller, McCarthy & Cowherd (MM&C), a leading Fort Lauderdale real estate brokerage firm, and discussions concerning the formation of a south Florida real estate development company ensued.

2. Through Mr. Kerver, Mr. Lee met Wallace W. Kennedy, an attorney for

MM&C who indicated he would be willing to act as general legal counsel and recommended that the law firm of Tew, Tew, Rozen & Murray, specializing in securities law be retained to handle the contemplated public stock offering for the proposed company.

3. On February 17, 1971, a meeting was held in Ft. Lauderdale and was attended by Messrs. Wade E. Canfield, the defendant Lee, Mr. Kerver, Mr. Kennedy, Mr. Thomas Tew, and Mr. Robert Rozen of the law firm of Tew, Tew, Rozen and Murray (TTR&M). At the meeting, the decision was made to form a real estate investment corporation and raise approximately $300,000 in a limited initial offering to a small group of business and social associates. After the initial offering, the corporation would begin seeking real estate projects in which to invest the capital, and begin preparing to register a more substantial public offering of common stock with the U.S. Securities and Exchange Commission (SEC) as well as the appropriate state authorities.

4. Tew, Tew, Rozen & Murray were retained by Mr. Lee to act as securities counsel and prepare the Registration Statement for the planned corporation. He believed TTR&M to be expert and experienced in the field of securities regulation.

5. On March 25, 1971, a corporation, named Commercial Investment and Development Corporation of Florida (CIDC), was incorporated in the State of Florida. Within approximately one month thereafter, 24 individuals and the MM&C Pension Trust purchased a total of 6,710,000 shares of CIDC stock for an aggregate amount of $335,500.

6. Mr. Kennedy served as a board member, secretary, and general counsel to the newly formed corporation.

7. Mr. Lee was one of the five incorporators of CIDC, and became its president and a director on the date of its incorporation. He continues to hold these offices. Mr. Lee personally invested approximately $45,000.00 in the corpora-

tion. From March, 1971 through June, 1972, Mr. Lee devoted substantially all of his working time to the affairs of the corporation. He did not receive a salary or other compensation for his services.

8. On June 1, 1971, CIDC entered into a limited partnership entitled CIDC Ltd. I. Norman E. Anderson and Robert W. Anderson of the Anderson Construction Company (ACC) were the general partners. CIDC was the sole limited partner and it provided $42,000.00 as capital to the partnership. The CIDC Ltd. I project was a two-story, 20 unit, apartment building located in Fort Lauderdale, Florida. In August, 1971, CIDC Ltd. I contracted to sell the apartment building prior to its completion. CIDC realized a profit of approximately $14,000 or 33% of its investment.

9. On June 11, 1971, a second limited partnership was formed with the same general and limited partners as CIDC Ltd. I. The second project, CIDC Ltd. II, dealt with the construction of the 51-unit apartment building in Fort Lauderdale, Florida. CIDC again provided the investment capital of approximately $86,000; and, when the project was sold prior to construction, it realized a profit of approximately 33% of its investment.

10. In connection with the preparation of the registration statement, Mr. Kerver wrote attorney Tew a letter dated June 3, 1971, describing CIDC's activities and plans at that time.

11. On June 11, 1971, Anderson Construction Company acquired an option on a 99-year lease on an apartment site on the Intracoastal Waterway in Pompano Beach. Anderson Construction Company paid $5,000 for the option. CIDC was not involved in either the acquisition of, or payment for, this option.

12. Shortly after June 11, 1971, Anderson Construction Company discussed with CIDC a proposal to construct an apartment complex on the Pompano Beach site. At CIDC's request, Anderson Construction Company had a feasibility study of the project prepared by an independent consultant, Paul Pohly &

Associates. The study, dated July 1, 1971, was favorable to the project. Without committing itself further, CIDC agreed to pay one-half of the $1,000 cost of the study.

13. Upon completion of the study, Anderson Construction Company engaged, at its sole expense, architectural and engineering firms to begin developing plans for an apartment project on the Pompano Beach site. The project was subsequently named Casa La Quinta.

14. In order to obtain financing for the project Anderson Construction Company submitted an application to the South Florida Bond & Mortgage Company, on July 12, 1971, for financing in the amount of $2,350,000 for 25–28 years, at an interest rate of 9 to $9\frac{1}{8}\%$. CIDC was not involved in this effort to obtain financing.

15. In late July, Anderson Construction Company attempted to persuade CIDC to commit itself to the Casa La Quinta project. On approximately July 21, Anderson Construction Company submitted a letter agreement to CIDC but CIDC refused to sign the letter and commit itself because the plans for the project, particularly the mortgage financing arrangements, were too tentative.

16. Despite a favorable written recommendation, dated July 28, 1971, from Miller, McCarthy & Cowherd, CIDC continued to refuse to commit itself to the project.

17. As Tew, Tew, Rozen & Murray began preparing the registration statement, one major question which arose was whether to include a reference to the Casa La Quinta project in the statement in view of the tentative nature of the plans for the project. At Attorney Tew's request, Mr. Kennedy set forth in a letter dated August 3, 1971 the status of the project at that time:

"The corporation presently has under consideration a proposal from Norman E. Anderson and Robert W. Anderson for the joint development of a rental apartment project in Pompano Beach, Florida. If accepted by the corporation, this venture would take the form of a limited partnership in which Norman E. Anderson and Robert W. Anderson would be the general partners and the corporation would be the limited partner. The basic terms of the limited partnership agreement would be essentially the same as previously employed by the parties and CIDC Ltd. I and CIDC Ltd. II. All profit would be allocated on the basis of two-thirds to the general partners and one-third to the limited partner. The proposed development would be a four-story garden-type rental apartment building which would be constructed on land leased by the partnership at an annual rental of $50,000.00 subject to rental adjustments every ten years based on a consumer price index. The proposed lease would provide for the payment of first and tenth years' rental in advance totaling $100,000.00. This would be the total contribution by the corporation to the limited partnership. The proposed lessor has agreed to subordinate the lease to the lien of an institutional mortgage lendor which it is believed will enable the partnership to obtain 100% financing of the construction costs. The corporation has caused a feasibility study to be made on this project, which report indicates that the project should be a very profitable venture. The board of directors of the corporation have given their tentative assent to this project subject to the proposed general partners securing adequate financing. If adequate financing is arranged and the corporation enters into a limited partnership with Norman E. Anderson and Robert W. Anderson for the development of this project, then the corporation will also consider the two additional projects in the same immediate area and on the same basis.

"That about sums up the present status as I see it, Tom. Unofficially, we have had regional approval of the

mortgage loan, but so far as I know, we at this time have nothing in writing nor any verbal final approval."

(Defendants' Exhibit #11)

18. On August 6, 1971, there was a meeting at the offices of CIDC in Fort Lauderdale, Florida. Those in attendance were: Mr. Lee, Mr. Kennedy, Mr. Jeske and Edwin P. Bergeron (directors of CIDC); attorneys Tew and Rozen; John King of Ernst & Ernst, CIDC's independent CPA firm; and Mr. Kerver of MM&C. The primary purpose of the meeting was to begin preparation of the registration statement. All of CIDC's present and proposed projects were reviewed. With reference to the proposed Casa La Quinta project, it was noted that a favorable feasibility study had been received. Mr. Rozen indicated in his notes of the meeting that the study would be needed as an exhibit to the registration statement. The group was advised that Anderson Construction Company had applied to Penn Mutual Insurance Company through South Florida Bank and Mortgage Company for financing for the project, and approval of the financing had been granted verbally by the insurance company's regional office in Atlanta. Mr. Rozen's conclusion on August 6, 1971, was, however, that CIDC was "merely exploring the possibility [of the project]. There was no definite agreement." Record, vol. II, at 20.

19. On August 10, 1971, Mr. Lee mailed identical letters to each of the 25 CIDC shareholders. As part of a policy of keeping its small group of initial investors informed of the status of the company, CIDC had previously sent two letters to its shareholders.

20. Mr. Lee believed from discussions with CIDC's counsel, Mr. Kennedy and Tew, Tew, Rozen and Murray, that it was not only desirable to keep the small group of original investors informed but also that he was legally obligated to do so.

21. In addition to providing descriptions of CIDC's investment policies and the progress of both CIDC Ltd. I and CIDC Ltd. II, the August 10, 1971 letter described what was then the status of the proposed Casa La Quinta project:

Also ready to start are beautiful, moderate-rental apartments well located on Intracoastal Waterway in Pompano Beach. This garden-type project will be constructed in three phases of 160 units each, plus large recreation area, clubhouse and pool—also boat docks. Tentative approval of financing has been received and construction will commence immediately upon final approval, hopefully in August, 1971."

(Plaintiff's Exhibit #3)

22. With respect to the planned public offering of stock, the August 10, 1971 letter stated:

"It should be apparent that this is a company which is on the move and we solicit participation from investors who are ready, willing and anxious to move with us. The first offering of C.I.D.C. stock is limited and blocks of stock will be allocated in the order that Letters of Interest are received in our offices.

"This is to advise you that C.I.D.C. is in the process of preparing the Registration Statement for our ten cent stock issue which will be on the market in the near future.

"We will issue ten million shares at ten cents a share generating one million dollars. This issue will be sold in units of fifty thousand shares at ten cents a share totalling $5,000 per unit.

"Due to SEC regulations we can only discuss this stock amongst the pre-investors. We can be thinking about friends who we would like to have for partners in C.I.D.C. We will contact these friends *after* we have filed with SEC and the Red Herring has been issued. In as much as we cannot discuss this stock with outsiders, we are asking you to give us names, addresses and telephone numbers of those friends you would like to see as partners in C.I.D.C. Attached are forms for this purpose.

"The first offering of C.I.D.C. stock is limited and blocks of stock will be allocated to each pre-investor. Please give only those names you feel confident we can sell and the amount you think they will invest.

"We have had numerous requests from our pre-investors to buy some of the ten cent stock. This is to advise you we are setting aside one million two hundred fifty thousand shares (1,250,000) for the pre-investors to purchase. We will allocate fifty thousand shares to each investor. If you wish to take advantage of this offer please fill out one of the attached slips and state that you agree to purchase the stock when it becomes available. This agreement must be returned to this office by September 1, 1971. Should any of this assigned stock remain unclaimed, it will be offered to those pre-investors who wish to purchase additional units. This will be on a first come first serve basis.

"The balance in stock (8,750,000) shares will be sold to new investors who will be permitted a minimum of fifty thousand shares and a maximum of one hundred thousand shares.

"This is your Company and it will be your responsibility to work in every way possible to make this Company grow. *There should be no "free riders" in this Company!"* (Emphasis in original)

(Plaintiff's Exhibit #3)

23. Prior to mailing the August 10, 1971 letter, Mr. Lee did not submit a draft of the letter to CIDC's attorneys; nor did he review either the specific contents of the letter or the wording of the letter with CIDC's counsel.

24. After Anderson Construction Company learned that South Florida Bond and Mortgage had been unable to arrange for financing on the terms specified in Anderson Construction Company's application, Anderson Construction Company made a presentation of the project to Southeast Mortgage Company (Southeast) at a meeting held on Au-

gust 20, 1971. The meeting was attended by Norman Anderson and Mr. Bentley from Anderson Construction Company, and Robert Greenwalt, head of Southeast's Fort Lauderdale office. At the conclusion of the meeting, an application was submitted to Southeast for permanent mortgage financing in the amount of $2,250,000 for 30 years at an interest rate of 9¼. The application was signed by Messrs. Anderson and Bentley as "General Partners" of CIDC Ltd. III. Both they and Southeast knew that the partnership had not yet been formed, but since mortgage commitments are generally non-assignable, it was expeditious to make the application in the name of the entity which would probably take the loan. Also, Anderson Construction Company believed that a limited partnership would ultimately be formed with CIDC.

25. Southeast issued a letter, dated August 20, 1971, to Mr. Bentley which stated that if permanent financing was arranged, Southeast would provide construction financing for the project.

26. Within several days of the August 20, 1971 meeting, Anderson Construction Company sent Southeast a deposit of $22,500. CIDC played no part in these transactions and provided none of the $22,500 deposit.

27. After receipt of Anderson Construction Company's loan application, Southeast decided to attempt to place the loan with Aetna Life & Casualty Company (Aetna), and requested Anderson Construction Company to complete an Aetna application form, which Anderson Construction Company did on August 29, 1971. Norman Anderson and Bentley executed this application in the name of CIDC Ltd. III for the same reasons and on the same basis as the August 20 application. After submission of the application to Aetna, there were numerous calls between Anderson Construction Company and Southeast about the project. Aetna requested some changes in the plans, and a meeting was held at Aetna's offices in Connecticut which Mr. Greenwalt attended

to finalize these plans. Aetna also requested financial data on CIDC, with the specific understanding that if the Aetna financing were not approved, CIDC would not become a participant in the project.

28. On August 25, 1971, Mr. Rozen distributed to Messrs. Lee, Kennedy, and King a first printed draft of the registration statement, and a meeting was held on August 30, 1971 at CIDC's offices in Fort Lauderdale to discuss the draft.

29. The proposed Casa La Quinta project was one of the topics discussed at the meeting. CIDC wanted to include a description of Casa La Quinta in the registration statement primarily because it was a much more substantial project than the two earlier projects, and CIDC thought it would show the direction in which the company was moving. However, Tew, Tew, Rozen & Murray was concerned that the project was not yet a firm deal. Mr. Rozen ultimately decided that reference to the Casa La Quinta project should not be included in the registration statement. Instead, the SEC would be advised of the tentative plans for the project and provided with a copy of the feasibility report. This procedure is one which Tew, Tew, Rozen & Murray had followed many times in prior registration statements where questions were raised concerning the propriety of disclosing certain items.

30. Since Mr. Tew agreed with Mr. Rozen's decision, Tew, Tew, Rozen & Murray advised against including Casa La Quinta in the registration statement.

31. Southeast first presented the loan application to Aetna by mail on September 13, 1971. Mr. Greenwalt subsequently met with Aetna in Connecticut to discuss changes in the plans. Accordingly, the plans were modified and resubmitted to Aetna on October 1. It was not definite that the financing would be approved even if all of the changes were made.

32. On about October 1, Mr. Bentley received a verbal confirmation that Aetna would provide the requested financing, although the amount was reduced by $120,000. On October 20, 1971, Mr. Bentley agreed to reduce the requested construction financing by $120,000. CIDC Ltd. III did not receive a written commitment for construction financing for the project until after October 25, 1971. The construction contract between Anderson Construction Company and CIDC Ltd. III was signed on November 5, 1971. The construction loan closed in December, 1971; the permanent loan had not yet closed at the time of trial of this action. The project was ultimately constructed, although Anderson Construction Company sold its interest in January, 1972. By May, 1973, approximately 80 apartments had been constructed and occupied. CIDC's total involvement in the project was the provision of equity capital to the limited partnership.

33. While the loan application was being processed, Mr. Rozen personally filed the CIDC registration statement in Washington on September 16, 1971. The registration statement was accompanied by a transmittal letter, dated September 15, 1971, a copy of the feasibility study, and a letter describing the credentials of Paul Pohly & Associates. In part, the letter stated:

"There is herewith furnished as supplemental information, but not a part of the registration statement, a feasibility study prepared by Paul T. Pohly & Associates, together with qualifications and experience of the persons who prepared the feasibility study. The study was prepared at the request of the Company which is investigating the possibility of building an apartment building on a site located in Pompano Beach, Florida. As of this date, the Company has not entered into any agreement with respect to the property but is merely exploring the possibility of its development. If the Company enters into a binding agreement with respect to the property, such information will be furnished

by an amendment to the registration statement."

(Defendant's Exhibit #22)

34. In mid-September, 1971, as a result of his communications with various members of the SEC staff in connection with unrelated matters, Mr. Rozen had become aware that the SEC and/or its staff was concerned with the many real estate "blind pool" offerings that were being filed, and that registration statements for such offerings were being carefully reviewed. Accordingly, on September 16, 1971, Mr. Rozen visited the assistant branch chief of the SEC staff branch to which the CIDC Registration Statement had been assigned, Mr. Herbert Orenstein, for the purpose of personally describing the CIDC offering to him. Mr. Rozen advised Mr. Orenstein that he understood that the SEC and its staff were taking a careful look at real estate blind pool offerings, and accordingly, CIDC had made every effort to make adequate disclosure. Mr. Orenstein confirmed Attorney Rozen's understanding of the SEC's concerns with respect to real estate blind pool offerings.

35. Since Anderson Construction Company understood that CIDC would not commit itself to participate in the project until CIDC's Board approved the proposal, Bentley spoke to several other potential investors about possible participation. Bentley was sure that Anderson Construction Company would have no difficulty in obtaining equity capital if CIDC chose not to participate.

36. During a telephone call in late September, Anderson Construction Company received an informal indication that the loan could be obtained from Aetna. Bentley in turn relayed the information to Kennedy on approximately September 26, 1971.

37. Since the land option had to be exercised by October 1, 1971, and the funds were needed to exercise the option, CIDC had to decide whether to commit itself to the Casa La Quinta project. Having obtained the verbal commitment for financing, the Board of CIDC met on September 27, 1971 and approved the project. The limited partnership agreement, which had been previously drafted by Kennedy, was executed and filed with the Secretary of State in Tallahassee, Florida. CIDC was advised that if it had not then agreed to participate in the project, it would have lost the opportunity to do so.

38. On September 30, 1971, Mr. Lee mailed to each of the 25 original CIDC shareholders a letter, which was entitled a "Newsletter," and a preliminary prospectus dated September 16, 1971. Mr. Lee had not previously submitted a draft of the letter to CIDC's legal counsel; nor had he reviewed the wording of the letter with counsel.

39. In pertinent part, the letter referred to the preliminary prospectus:

"Attached is your copy of the Prospectus and we request that you read it thoroughly. For some of you who are not familiar with a Prospectus that is being filed for the first time, this is to inform you that it is imperative to take a complete negative attitude in your Prospectus if you hope for prompt approval from the SEC."

(Plaintiff's Exhibit #4)

40. The "Newsletter" also described the status of the Casa La Quinta project:

"In addition to our projects outlined in the Prospectus, we will start construction on a 160 unit rental apartment complex. This will be the first of three phases of construction on this land. Phase one will be a $2,350,000 project. Phases two and three will be approximately the same. Total cost of phases one, two, and three will be $7,050,000. This project will be located at 28th Avenue and the 14th Street Causeway Bridge on the Intercoastal Waterway in Pompano."

(Plaintiff's Exhibit #4)

41. The September 30, 1971 letter referred to the planned public offering of stock:

"As you know, your officers work for your company without any remunera-

tion. We are all partners in C.I.D.C. and it is each stockholder's responsibility to assist your officers by promoting the sale of C.I.D.C. stock.

"As of this date, we have letters of interest for over half of our 10 cent issue. It's our wish to have the ten million shares committed by the time we receive SEC approval. At this time we will come out with another Prospectus for five million shares at 50 cents a share which will generate $2,500,000. Upon the completion of our sale of the 10 cent issue, your officers and fellow stockholders will have saved the company $150,000 in underwriter's fees. Ask yourself this question—Am I one of those stockholders who has contributed to this savings or am I a stockholder who is going along for a free ride? It is imperative that each stockholder contribute some of his time in the development of C.I.D.C. and you can only do this by advising your officers of friends and associates that you would like for us to contact.

. . . . . .

"WE MUST HAVE YOUR HELP TO ACCOMPLISH THIS GOAL."

(Plaintiff's Exhibit #4)

42. The "Newsletter" set forth what Mr. Lee said were the company's plans for future stock offerings:

"Our long-range plans for the next three years or less will be five million shares at 50¢—$2,500,000; six million shares at $1—$6,000,000; One million shares at $2—$2,000,000; one million shares at $3—$3,000,000; one million shares at $4—$4,000,000; and one million shares at $5—$5,000,000—generating a total of $23,500,000."

(Plaintiff's Exhibit #4)

In determining the projected market price of CIDC stock, Mr. Lee had not consulted an accountant or a financial analyst. Nor had he reviewed the figures with any other officer of CIDC.

43. Following the formation of the limited partnership for the Casa La Quinta project, CIDC began preparing an amendment to the registration statement which would have disclosed the status of the project. The amendment was never filed because of the commencement of the SEC's investigation of CIDC.

44. By letter dated September 29, 1971, Mr. Lee requested Mr. Rozen to draft a letter which could be used to transmit copies of the Preliminary Prospectus to persons who might be interested in purchasing the CIDC stock. In response, Mr. Rozen sent Mr. Lee a draft transmittal letter. The attorney also advised Mr. Lee that, enclosed with the transmittal letter, he could send a coupon or postcard which could be filled out by a person who wished to indicate that he was interested in the stock offering. The letter, suggested by Rozen, was ultimately used to transmit copies of the Preliminary Prospectus to members of the public.

45. When, on December 1, 1971, the attorneys Rozen and Tew, learned that the SEC had begun a private investigation of CIDC, they advised Theodore A. Doremus, a member of the SEC staff, that CIDC would fully cooperate with the Commission in order to expedite the investigation and resolve any possible problems.

46. Two subpoenas were issued on December 3, 1971, one to CIDC for certain documents, and one to Mr. Lee, which required his testimony on December 14, 1971 at the SEC's Miami office. The letters from the SEC transmitting the subpoenas included the following statement:

"I want to emphasize that the investigation is private and request that such privacy be maintained."

(Defendant's Exhibit #29)

47. In early December, 1971, after Mr. Rosen advised Mr. Lee to do so, CIDC discontinued both the distribution of the Preliminary Prospectus, and all solicitations of interest.

48. At Mr. Lee's deposition on December 14, 1971, the SEC staff members

disclosed that they were concerned with the failure of the Preliminary Prospectus to include a reference to a limited partnership known as CIDC Ltd. III. After attorneys Tew and Rozen asked if the SEC staff members had read the transmittal letter dated September 15, 1971, the SEC staff members responded that they had not read the letter. Mr. Rozen immediately furnished copies of the letter to Mr. Doremus and another staff member, William Gleeson.

49. On behalf of CIDC, Tew, Tew, Rozen & Murray repeatedly offered to cooperate with the SEC in order to expedite the investigation and bring it to a conclusion.

50. On February 18, 1972, attorneys Tew and Rozen met with Mr. Gleeson at the SEC's office in Washington, who advised them that the SEC had adopted a policy of reviewing very carefully the registration statements of new real estate companies, particularly ones in which funds were to be invested in projects at the discretion of the Board of Directors.

51. On March 3, 1972, Mr. Lee sent to Tew, Tew, Rozen & Murray a draft of a newsletter that he proposed to send to the original 25 shareholders, and to other persons who had indicated an interest in the proposed public offering. Messrs. Tew and Rozen reviewed the draft and decided that the letter should be sent only to existing shareholders. They made several other revisions in the draft, and added the following statements:

> "We have been advised that in accordance with their [the SEC's] normal policy, they are carefully reviewing many start-up real estate development companies like our own. Accordingly, members of the SEC staff have contacted officers and stockholders of the Company to confirm certain of the information disclosed in our Registration Statement."

52. Because of the admonitions they had received from the SEC staff concerning the privacy of the investigation,

Messrs. Tew and Rozen did not believe that it was appropriate to describe the SEC's investigation in greater detail.

53. Tew and Rozen sent the revised report back to Lee. Consistent with the advice of Tew and Rozen, Lee mailed the report only to the original 25 CIDC shareholders. Mr. Lee believed that the statements included in the revised report were accurate, and appropriately disclosed the basis for the delay in the public offering.

54. On March 15, 1972, Mr. Rozen voluntarily mailed a copy of the March 1972 report to Mr. Doremus at the SEC. The SEC staff did not ever request Tew, Tew, Rozen and Murray to modify or retract the report.

55. On March 21, 1972, Mr. Rowe indicated to Mr. Rozen that the SEC had been unable to contact five CIDC shareholders. Mr. Rozen suggested that CIDC would attempt to contact these shareholders and have them call the SEC. Messrs. Rowe and Rozen discussed what should be told to these people when CIDC called them. Mr. Rowe advised Mr. Rozen that it would be acceptable if CIDC told its stockholders that the SEC was making a careful review of new real estate development companies and was contacting various officers and stockholders of CIDC to confirm the information and disclosures in the Registration Statement.

56. During the course of its investigation, the SEC staff interviewed by telephone a total of 11 CIDC shareholders. To describe the reason for its activity, the SEC staff told each of these persons that an inquiry was being conducted into the "adequacy and accuracy of statements made in the registration statement and certain other matters." (Defendant's Exhibit #41).

57. While the investigation continued, CIDC entered into a fourth project for a 500-unit condominium in Delray Beach. CIDC ultimately sold its interest in the project at a profit. Without the capital which the registered offering

would have provided, CIDC was unable to enter into any additional projects.

58. On February 1, 1973, CIDC requested the SEC to withdraw the registration statement. CIDC made similar requests to each of the five state blue-sky authorities to whom CIDC had applied to register the proposed offering. The corporation also filed dissolution papers with the Florida Secretary of State.

59. As president and director of CIDC, Mr. Lee acted without any intention of violating the securities laws. Many of his actions were based on the advice of counsel whom he believed to be competent attorneys who were advising him and CIDC in the utmost good faith. However, Mr. Lee did not rely on the advice of counsel when he prepared and mailed both the August 10, 1971 letter and the September 30, 1971 "Newsletter."

60. Mr. Lee is 53 years old, married and has children. Due to health problems, Mr. Lee does not have a present intention of becoming involved in another real estate development company. However, if his health should improve and he is again confronted with the opportunity to do so, he would "go into another development company, because there is a need for it in Florida." Record, vol. II, at 241.

## CONCLUSIONS OF LAW *

61. The court has subject matter jurisdiction over the present action. 15 U.S.C. § 77v(a) (1970).

62. The plaintiff Commission has standing to maintain the present action. 15 U.S.C. § 77t(b).

63. As they are employed in the Securities Act of 1933, the terms, "offer to sell", "offer for sale", and "of-fer", include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." Section 2(3) of the Securities Act of 1933 (Hereinafter "Securities Act"), 15 U.S.C. § 77b(3).

64. The import of the August 10, 1971 letter was to solicit CIDC shareholders to offer to buy part of the proposed public offering, and to encourage CIDC shareholders to solicit non-shareholders to buy CIDC stock. The letter constituted an "offer to sell" within the meaning of the Securities Act, 15 U.S.C. § 77b(3). See Chris-Craft Industries, Inc. v. Bangor Punta Corp., 426 F.2d 569 (2nd Cir. 1970); SEC v. Arvida Corp., 169 F.Supp. 211 (S.D.N.Y. 1958).

65. Since the CIDC registration statement was not filed until September 16, 1971, the use of the mails by the defendants, Lee and CIDC, to transmit the August 10, 1971 letter violated section 5(c) of the Securities Act, 15 U. S.C. § 77e(c).

66. Section 2(10) of the Securities Act defines the term, "prospectus", as "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security." 15 U.S.C. § 77b(10).

67. The September 30, 1971 "Newsletter" stressed the importance of CIDC shareholders soliciting persons other than CIDC shareholders to offer to buy part of the proposed public offering. The "Newsletter" was an "offer to sell" within the meaning of section 2(3) of the Securities Act, 15 U.S.C. § 77b(3). As such, the September 30, 1971 letter was a "prospectus" separate

---

* In its motion for summary judgment, the SEC claimed that the defendants had committed other acts which violated sections 7, 10 and 17 of the Securities Act. The claimed violations were based on the alleged failure of the defendants to disclose both the method by which the stock would be distributed and the fact that the defendant Lee never graduated from college. These additional claims were not included in the SEC's complaint, and the SEC never sought leave to file an amended complaint. In view of the defendants' objections to the consideration of the additional issues, the court expressly withholds any decision as to whether the other alleged nondisclosures violated the Securities Act.

and distinct from the preliminary prospectus, previously filed with the SEC, which accompanied the letter. *See* SEC v. Arvida Corp., *supra.*

■ 68. In view of the August 10, 1971 letter and the September 30, 1971 "Newsletter", the March 1972 report was part of the continuing solicitation of persons other than CIDC shareholders to offer to buy CIDC stock. The report was an "offer to sell" and thus a "prospectus" within the meaning of section 2(10) of the Securities Act, 15 U.S.C. § 77b(10). *See* SEC v. Arvida Corp., *supra; cf.* SEC v. Okin, 132 F.2d 784 (2d Cir. 1943).

69. Neither the September 30, 1971 "Newsletter" nor the March 1972 report contained the information prescribed by section 10 of the Securities Act, 15 U.S.C. § 77j, and Schedule A of the Securities Act, 15 U.S.C. § 77aa.

■ 70. The use of the mails by the defendants, Lee and CIDC, to transmit the September 30, 1971, "Newsletter" and the March 1972 report violated section 5(b)(1) of the Securities Act, 15 U.S.C. § 77e(b)(1).

71. Item (8) of Schedule A of the Securities Act requires that the registration statement include information concerning "the general character of the business actually transacted or to be transacted by the issuer." 15 U.S.C. § 77aa(8).

■ 72. Since CIDC had not finally approved its participation in the Casa La Quinta project as of the date the registration statement was filed, CIDC was not required to include in the registration statement a reference to the project. Insofar as the registration statement did not refer to the Casa La Quinta project, the registration statement filed by the defendants, Lee and CIDC, did not violate sections 7 and 10 of the Securities Act, 15 U.S.C. §§ 77g, 77j.

■ 73. The defendants, Lee and CIDC, were not required to disclose the Casa La Quinta project in the preliminary prospectus filed with the SEC. As

a result, the use of the mails by the defendants, Lee and CIDC, to transmit the preliminary prospectus to the CIDC shareholders did not violate the anti-fraud provision, section 17(a), of the Securities Act, 15 U.S.C. § 77q(a).

■ 74. The reference, in the September 30, 1971 "Newsletter", to the plans for future stock offerings was materially misleading because the projections concerning the prices, at which the stock would be sold, had no basis in fact. *See* SEC v. Broadwall Securities, Inc., 240 F.Supp. 962 (S.D.N.Y.1965); SEC v. F. S. John & Co., 207 F.Supp. 566 (D.N.J. 1962).

75. The use of the mails by the defendants, Lee and CIDC, to transmit the September 30, 1971 letter violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

■ 76. The March 1972 report adequately disclosed the reason for the SEC's delay in approving the CIDC registration statement, and thus the report was not materially misleading.

77. The use of the mails by the defendants, Lee and CIDC, to transmit the March 1972 report did not violate section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

■ 78. A permanent injunction against future violations of the securities laws is appropriate where there is a reasonable likelihood that the wrong will be repeated. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082 (2d Cir. 1972); *see* United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). A reasonable expectation of future violations may be inferred from the number and nature of past violations. SEC v. Manor Nursing Centers, Inc., *supra;* SEC v. Keller Corporation, 323 F.2d 397 (7th Cir. 1963); SEC v. Culpepper, 270 F.2d 241 (2d Cir. 1959).

■ 79. Not only the number of violations of the Securities Act but all of the circumstances of the present case indicate a reasonable likelihood that the

wrong will be repeated. Accordingly, the public interest would be best served by enjoining the defendants, Mr. Lee and CIDC, from violating section 5(b)(1) and section 5(c) of the Securities Act, 15 U.S.C. §§ 77e(b)(1), (c), and section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).