**Gerald M. HOCKING,
Plaintiff-Appellant,**

v.

**Maylee DUBOIS and Vitousek & Dick Realtors, Inc., a Hawaii corporation, Defendants-Appellees.**

No. 85-1932.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1988.
Decided Sept. 21, 1989.

Patrick C. Clary, Las Vegas, Nev., for plaintiff-appellant.

Samuel H. Gruenbaum, Los Angeles, Cal., for defendants-appellees.

Before GOODWIN, Chief Judge, BROWNING, SCHROEDER, FLETCHER, NELSON, NORRIS, WIGGINS, BRUNETTI, NOONAN, O'SCANNLAIN and TROTT, Circuit Judges.

GOODWIN, Chief Judge:

Gerald M. Hocking, a disappointed purchaser of a unit in a condominium complex in Hawaii sued the brokers who sold the unit, claiming violations of the antifraud provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (1982), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988). He appeals a summary judgment in favor of the brokers.

After a three-judge panel's decision had reversed the summary judgment,[1] the court

---

1. 839 F.2d 560 (9th Cir.1988) (opinion with-drawn by order of December 7, 1988).

granted rehearing en banc and the case was reargued on supplemental briefs focused upon the question whether the transaction at the heart of this case involved a "security" within the meaning of the federal security laws.

The district court noted that "this action lies close to the edge of those transactions which have been found to be regulated by the Securities Act as investment contracts," but concluded that Hocking had not raised a triable issue of material fact as to whether DuBois had offered him a "security."

At best we can ascertain from the present record,[2] and reading it in the light most favorable to Hocking, the facts are as follows:[3]

Hocking was a resident of Las Vegas, Nevada. Following a visit to Hawaii, Hocking became interested in purchasing a condominium there as an investment. Deposition at 12, 52. Dubois was a real estate agent licensed in Hawaii, employed by defendant Vitousek & Dick Realtors, Inc. Dubois met Hocking through her husband, one of Hocking's co-workers. Deposition at 12.

Dubois agreed to search for a condominium for Hocking, and in the spring of 1979 proposed that Hocking purchase a condominium in the resort complex at 2121 Ala Wai, Honolulu, which had been listed with Vitousek & Dick. Deposition at 7–8. The resort complex was developed by Aetna Life Insurance Company, and was still un-

der construction at that time. Deposition at 33. Hocking had told Dubois that he wanted to buy a condominium directly from the developer, to be a "first person buyer." Deposition at 8. In fact, the condominium unit sold to Hocking was owned by Tovik and Yaacov Liberman, who had purchased from the developer. Agreement of Sale, ER at 10, 19. Hocking did not independently inquire into who was developing the complex at 2121 Ala Wai, but relied on Dubois' assurances that he would be purchasing directly from the developer. (At this stage of the record the question of buying directly from the developer or in the "secondary" market is only of evidentiary value in shedding light on the terms of sale). Hocking had no contact with Aetna, and he knew of no connection between defendants and the builders of the condominium complex. Deposition at 101–102.

Dubois told Hocking, according to his deposition, that "the investment would be handled [for him] by a local company, or her company or someone that she would help [him] get in touch with." Deposition at 8. She informed Hocking that a rental pool arrangement (RPA) would be available to Hocking if he were to purchase the condominium. She also told him that the condominiums were renting for an average of $100 a day, from which he calculated the monthly income would be $2,000 to $3,000 per month. Affidavit at 2. He relied on the expected rental income to cover his monthly payments and provide additional

---

**2.** In support of their motion for summary judgment, defendants submitted excerpts from Hocking's deposition. The remainder of the deposition is not in the record. Hocking challenges the admissibility of sections of his deposition. As he failed to object before the district court, he has waived this argument and may not raise it on appeal.

**3.** In stating the "facts" we rely on Hocking's deposition testimony, his affidavit, and the relevant agreements, all read in light of his complaint. We recognize that, with regard to issues raised by defendants in their joint motion for summary judgment, Hocking "may not rest upon the mere allegations" of his complaint. Fed.R.Civ.P. Rule 56(e). With regard to those "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which [defen-

dants] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), we do not rely on the complaint, but provide record citations to the facts Hocking relies upon. In describing the background of the case, however, we include facts that are, at present, mere allegations of the complaint, not challenged by defendants in their motion for summary judgment. We do not mean to suggest that, should defendants challenge—by motion for summary judgment, for a directed verdict, or for judgment notwithstanding the verdict—whether Hocking has raised a triable issue of fact on some other issue, for instance, whether he has produced any evidence that he actually lost his investment, our statement that he lost the investment should be construed as creating a triable issue on that question.

income. *Id.* While Dubois expressed no requirement that Hocking participate in the rental pool arrangement, Hocking testified that but for the availability of the rental pool arrangement he would not have purchased the condominium. Deposition at 62–63.

Hocking entered into an agreement to purchase the condominium from the Libermans. He signed the agreement on June 23, 1979 in Nevada, and Tovik Liberman signed on July 2, 1979 in Hawaii. Agreement of Sale, ER at 19. Hocking also entered into several agreements with Hotel Corporation of the Pacific (HCP) concerning rental of the condominium.

On June 29, 1979 he signed a rental management agreement (RMA) appointing HCP exclusive agent to manage his condominium. ER at 24. He also entered into an Individual Agency Rental Agreement for Pooled Operation, the RPA, executed on July 5, 1979, to become effective on December 20, 1979. Supplemental ER at 240. This agreement placed Hocking's condominium in HCP's rental pool.[4]

Finally, on July 21, 1979, he signed an addendum to the RPA, which HCP executed on July 31, 1979. Supplemental ER at 243. Among other things, this addendum postponed the effective date of the RPA until the earlier of December 31, 1982 or that time when the developer had sold all the units in the development.

Hocking testified in his affidavit that Dubois presented these agreements to him and assured him they were mere standard forms, and further, that he neither read nor fully understood the agreements he signed. Affidavit at 4.

The rental management agreement gave Hocking the right to terminate the RMA upon 30–days written notice, with termination effective at the end of any current lease. The RPA's termination provisions are more complicated. During the initial year of pooled operation Hocking had the right to terminate at any time upon 15–days notice. In subsequent years he could terminate the RPA once annually upon 90–days notice. HCP reserved the right to terminate should the number of units participating in the rental pool fall below 40 percent of the total number of units in the complex. The condominium owners could collectively terminate the RPA upon an election to do so by 75% of those participating in the RPA. The RPA was to terminate on December 31, 1984. Finally, HCP was given the option to renew the RPA for two additional five-year terms.

Hocking alleges that his investment was entirely passive, and that he relied on Dubois to select, manage, and protect his investment. Third Amended Complaint at 2–3. He relinquished control of his investment at the time he purchased it and had access to his unit for only two weeks each year. Affidavit at 3. He knew that approximately fifty other condominium owners participated in the rental pooling arrangement. *Id.* When he visited the building in Hawaii, he observed that it was operated like a hotel, and he received copies of brochures and advertisements which HCP distributed on the mainland. *Id.*

Hocking purchased the condominium for $115,000, with a downpayment of $24,000 and installment payments on the remaining portion of the purchase price through June 1982, at which time all unpaid amounts were to become due. Hocking's complaint states that he "cancelled" his investment when this balloon payment came due. Third Amended Complaint at 4. The failure to make the payment apparently caused the forfeiture of his prior payments. He claims the loss of his investment was caused by the failure to receive the expected rental income, and by further misrepresentations of Dubois concerning appreciation in the value of the condominium and her efforts to resell the condominium in 1981 and 1982. Third Amended Complaint at 3–5; Affidavit at 2–3.

We are in general agreement with the three-judge panel's statement of our function in reviewing a summary judgment:

---

4. Under the RPA, HCP is responsible for renting as many of the participating units in the complex as possible; the rental income from the units is pooled, and after each owner is assessed a pro rata share of HCP's costs, each owner receives a pro rata share of the rental income, whether or not his individual unit has actually been rented.

We review the grant of summary judgment *de novo*. *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1390 (9th Cir.1986). Our task is identical to the trial court's: while viewing the evidence in the light most favorable to Hocking, we must determine whether the defendants have shown that there are no disputed issues of material fact and that they are entitled to judgment as a matter of law. *Alaska v. United States*, 754 F.2d 851, 853 (9th Cir.), *cert. denied*, 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985). We also review *de novo* the district court's determination whether a transaction is a security. *Belmont Reid & Co.*, 794 F.2d at 1390.

839 F.2d at 563.

■ The Supreme Court has provided further guidance on the appropriateness of summary judgment in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Celotex* tells us that on an issue where the plaintiff has the burden of proof, as Hocking does here, the defendant may move for summary judgment by simply pointing out the absence of facts to support the plaintiff's claim, "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

Defendants' joint motion for summary judgment identified portions of the pleadings and other materials which they believed demonstrated the absence of a genuine issue of material fact. Defendants claimed they were entitled to summary judgment because: (1) Hocking had no contact with the developer, Aetna; (2) Hocking alleged no connection between defendants and Aetna; (3) Hocking did not depend on HCP to increase the value of his condominium; (4) Hocking was not required to enter into the RPA as a condition of purchasing the condominium; (5) defendants made no representations regarding how much income the condominium would produce; and (6) Hocking intended to sell the condominium within a short time after purchase.

Defendants claimed that, based on these facts, Hocking had failed to raise a triable issue of fact as to whether he had purchased a security. First, Hocking's testimony established that he did not depend on HCP to increase the value of his property, making it clear that he was not dependent upon the managerial efforts of others, and therefore failed to meet the *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), test as outlined in *SEC v. Glenn W. Turner Enters, Inc.*, 474 F.2d 476 (9th Cir.1973).

Second, Hocking did not purchase the condominium from Aetna, he was not required to enter into the RPA as part of the purchase, the previous owner had not entered into an RPA, and the rental agreement he entered into was not part of the sale of the Liberman's condominium. Therefore, Hocking had not raised a triable issue as to whether there was an "offering" as required under Securities Act Release No. 33–5347.[5]

Third, Hocking had proposed to Dubois that he enter into a like-kind exchange for the condominium. This proposal demonstrated that Hocking was well-informed, sophisticated, and placed little reliance on Dubois.

Hocking responded with an affidavit. He testified, among other things, that: (1) while Dubois did not represent how much rent he would receive each month, she did

---

5. In their joint motion for summary judgment, defendants did not challenge the factual allegation of Hocking's complaint that Dubois informed Hocking a rental pool would be available to him, and "Dubois offered to Hocking ... a rental arrangement or rental pool arrangement...." Complaint at 2. As counsel for Vitousek & Dick stated in oral argument before the three-judge panel, "it is undisputed that the broker did, at his request, go out and find him someone to enter into a rental agreement with him. There isn't any question about that."

tell him what he could expect on a daily basis; (2) he did depend on income from the pooling agreement to cover monthly rent payments, and would not have purchased the condominium without the collateral rental agreements; (3) failure to receive the rental income led to loss of the investment; (4) he did rely on the managerial efforts of HCP, relinquishing control over the condominium to HCP and giving up access for all but two weeks a year; (5) he was not a sophisticated investor, but lacked education, training, or experience; (6) the like-kind exchange was not his idea, but something proposed to him by a local real estate agent in Las Vegas; (7) Dubois repeatedly told him that the value of the condominium was increasing, and that he should not sell it.

Hocking did not deny his lack of contact with Aetna, or his lack of knowledge of any connection between defendants and Aetna.

As the non-moving party, Hocking had no occasion to raise issues of fact regarding any links between Dubois and HCP, since defendants had not claimed that the lack of such links entitled them to summary judgment.

■ In order for Hocking to make a claim under the securities laws, he must show that Dubois' alleged misrepresentations were made in connection with the purchase or sale of a security. Both section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1) (1982), and section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(1)(10) (1982), define the term "security" to include any "investment contract."

The term "investment contract" has been interpreted to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be ..." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). "It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey Co.*, 328 U.S. at 299, 66 S.Ct. at 1103 (1946).

In *Howey,* the Supreme Court found that the combined sale of land and a land service contract, under which the purchaser

relinquished all control over the land for a 10–year period, was an investment contract. The Court there put forward the classic definition of an investment contract:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*Id.* at 298–99, 66 S.Ct. at 1103. *Howey* rejected the suggestion "that an investment contract is necessarily missing ... where the tangible interest which is sold has intrinsic value independent of the success of the enterprise as a whole." *Id.* at 301, 66 S.Ct. at 1104.

■ Subsequent cases have merely refined the three prongs of the *Howey* test. While the first prong, an investment of money, has proved relatively simple, the other two have evolved with time. As discussed below, the second prong's requirement of a "common enterprise" has been construed by this Circuit as demanding either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality).

■ While *Howey*'s third prong demanded an expectation of profits "solely from the efforts of the promoter or a third party," *Id.*, 328 U.S. at 299, 66 S.Ct. at 1103, we have dropped the term "solely" and instead require that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Glenn W. Turner Enters.*, 474 F.2d at 482.

We must therefore determine whether Hocking's purchase of a condominium and rental pool was (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits produced by the efforts of others.

In *Howey*, as here, the investors purchased real estate and at the same time relinquished much of the right to use or enter the property. 328 U.S. at 296, 66 S.Ct. at 1101. In *Howey*, as here, the investors were not obligated to purchase the service contracts, and in fact some decided to purchase the land without a service contract. *Id.* at 295, 66 S.Ct. at 1101. In *Howey*, as here, the investors were generally nonresidents who lacked the skill, knowledge and equipment necessary to manage the investment. *Id.* at 296, 66 S.Ct. at 1101.

There is no doubt that, had Hocking purchased the condominium and the rental pool directly from the developer and an affiliated rental pool operator, and had the rental pool been for a long term without any provision for early termination, Hocking would have purchased a security. If that were the case, we would merely substitute Hocking's Hawaiian condominium for *Howey*'s Floridian citrus grove.

Hocking, however, did not purchase the condominium in the initial offering from the developer. He purchased in the secondary market from the Libermans. Further, Hocking entered into the rental pool agreement with HCP, and has, defendants argue, failed to demonstrate any link between HCP and the developer. Finally, unlike the investors in *Howey*, Hocking could legally terminate the RPA according to its terms and regain control over the condominium. We must determine therefore whether these differences from *Howey* make Hocking's alleged transaction into an ordinary real estate purchase or whether it nevertheless could prove to be the purchase of a security.

## SECURITIES AND EXCHANGE COMMISSION RELEASE

The Securities and Exchange Commission has long recognized the securities laws' potential applicability to sales of con-

dominiums for investment. In 1973 the SEC issued a release in order to "alert persons engaged in the business of building and selling condominiums ... to their responsibilities under the Securities Act and to provide guidelines for a determination of when an offering of condominiums or other units may be viewed as an offering of securities." Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act Release No. 33–5347, 1 Fed.Sec.L.Rep. (CCH) ¶ 1049 (Jan. 4, 1973) (listed at 17 C.F.R. § 231.5347 (1988)).

Release 5347 puts developers and promoters on notice of three situations which the SEC views as involving the offering of a security.[6] The three-judge panel found the second of these situations present: Hocking's transaction included "[t]he offering of participation in a rental pool arrangement." While the district court had held that the optional nature of the rental pool took it out of the SEC guidelines, the panel rightly pointed out that neither Release 5347 nor *Howey* are limited to mandatory collateral arrangements. 839 F.2d at 565. The release speaks of an "offering" of a rental pool arrangement, not a requirement that the purchaser enter an RPA. As noted above, in *Howey* the purchasers were not obligated to enter into service contracts.

On rehearing en banc, the Securities and Exchange Commission has filed an *amicus* brief with the court, putting forward a different argument why Release 5347 is not controlling. The SEC points out that Release 5347 applies to "persons engaged in the business of building and selling condominiums ...," 1 Fed.Sec.L.Rep. (CCH) ¶ 1049, at 2070, and not to brokers in the secondary market. Not only does the SEC claim the release applies only to develop-

---

**6.** The release describes three situations which would involve the offering of a security:

1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.

2. The offering of participation in a rental pool arrangement; and

3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

38 Fed.Reg. at 1735, 1736 (1973).

ers, it claims that, although not readily apparent from the language of the release, and although perhaps inconsistent with the SEC Division of Corporate Finance's refusal to take a no-action position in *Embarcadero*, [1976–77] Fed.Sec.L.Rep. (CCH) ¶ 80,956 (Dec. 3, 1976), the release only applies to developers who have an affiliation or selling arrangement with a rental pool operator.

Given the SEC's position, we do not rely on Release 5347 in determining whether Hocking was offered a security. We instead examine the alleged transaction entirely in terms of the *Howey* test.

## THE PACKAGE OFFERED TO HOCKING

Before applying the *Howey* test to the facts of this case, we must determine what exactly Dubois offered to Hocking. Most of the cases finding a real estate transaction to involve a security have been direct offerings from a developer that include collateral agreements. This fact has led defendants to attempt to distinguish Hocking's purchase based on the lack of supposedly necessary links between the developer, the Libermans, HCP and Dubois. Hocking, however, has not claimed that the developer, the Libermans, or HCP sold him a security. He claims that by promoting the Libermans' condominium ' with an emphasis on the economic benefits to be derived from the managerial efforts of third parties designated or arranged for by Dubois," and by including with the condominium an offer for a rental arrangement or rental pool arrangement, *Dubois* offered him a security.

There is no question that Dubois offered Hocking the condominium. The Libermans had listed their unit with Vitousek & Dick, and Dubois acted as the Libermans' real estate agent in selling the condominium to Hocking. Defendants argue, however, that Dubois could not "offer" the RPA or other rental agreements to Hocking.

Nothing in the record indicates, and Hocking has not argued, that Dubois could legally bind HCP to enter into the RPA or other agreements with Hocking. There is no evidence that the Libermans transferred to Hocking a legally enforceable option to join the RPA, or that Dubois had legal authority to act on behalf of HCP. Dubois could not "offer" the RPA in the sense of common law contract offer and acceptance.

The inability of Dubois to make a binding contractual "offer" of the RPA to Hocking, however, does not mean that the RPA cannot be considered part of the package she offered him for purposes of determining whether that package was a security under *Howey*. In attempting to determine whether a scheme involves a security, the inquiry is not limited to the contract or other written instrument. "Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case." *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039–40 (10th Cir.1980) (citations omitted) (reversing dismissal of complaint claiming that land sale with collateral representations involved a security); *see also Jenne v. Amrep Corp.*, [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,343 (D.N.J.1978). As the Supreme Court has repeatedly said:

> [I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

*United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975). In defining the term investment contract, *Howey* itself uses the terms "contract, transaction or scheme," 328 U.S. at 298–99, 66 S.Ct. at 1103, leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general "scheme" of profit seeking activities. Such a "scheme" cannot be fully assessed by examining only those items a broker was legally authorized to offer an investor.

Similarly, it is worth noting that the term "offer" has a different and far broad-

er meaning in securities law than in contract law. *See, e.g., Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir.1971) (Friendly, J.); *SEC v. Commercial Inv. & Dev. Corp. of Florida*, 373 F.Supp. 1153, 1164 (S.D.Fla.1974) (finding a newsletter stressing the importance of shareholders' soliciting others was "offer to sell"). It is enough if the items were presented to Hocking as part of the same transaction or scheme, and that he purchased them as such.

Hocking states in his deposition and affidavit that Dubois assured him rental of his investment would be taken care of for him, Deposition at 8, that it would be handled by "the company" for him, Deposition at 27, that she informed him of the average daily rental, Affidavit at 2, that she presented the rental agreements to him for his signature, Affidavit at 4, and that without the rental agreements, he would not have entered into the transaction. Deposition at 62–63. It is undisputed that Dubois did go out and find someone to enter into a rental agreement with Hocking. These facts support the allegations of Hocking's complaint that:

> [a]s part of the said transaction, DuBois offered to Hocking and included [with the condominium] a rental arrangement or rental pool arrangement for the said condominium with emphasis on the economic benefits to Hocking to be derived from the managerial efforts of third parties designated or arranged for by Du-

Bois from rental of said condominium.... Hocking's said investment was entirely passive, and he relied solely upon DuBois to select, manage, and protect his investment.

Complaint at 2.

We also cannot ignore the fact that HCP did accept the RPA and other agreements Hocking signed, and that these agreements were entered into immediately following the purchase of the condominium.

 Even if Dubois could not legally bind HCP to enter into the rental arrangements with Hocking, we think it "not inappropriate that [Dubois'] offerings be judged as being what they were represented to be." *Joiner Leasing Corp.*, 320 U.S. at 353, 64 S.Ct. at 125 (1943). Hocking has put forward numerous facts concerning whether the condominium sale and rental agreements were presented to him as parts of one transaction. These facts distinguish this case from the everyday situation where a real estate agent or broker merely provides information to the purchaser regarding the availability of a rental pool or shared amenities such as a swimming pool or tennis courts. They also distinguish this case from the situation where, after a purchase and separate from any inducement to purchase, a real estate agent or broker arranges for a rental pool. Taken together these facts are sufficient to raise an issue of material fact for the trier to decide whether the RPA and other agreements were part of one scheme or transaction Dubois offered Hocking.[7]

7. In its amicus brief, the SEC argues that in the absence of any affiliation or selling arrangement between the sellers of the condominium (or the real estate agent) and the operator of the rental pool, the sale of a condominium is not a transaction that involves an investment contract. The SEC cites as authority directly supporting this proposition *Blackwell v. Bentsen*, 203 F.2d 690, 693 (5th Cir.), *cert. dismissed*, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1953). *Blackwell*, a case differing from *Howey* only in "minor and non-determinative" aspects, merely restates the test we apply today, finding an investment contract where the sales of citrus groves and the offering of management services, "although separate in form," "form constituent parts of what is essentially one transaction...." 203 F.2d at 692–93. Thus, while Judge Norris criticizes our "presented as part of the same transaction" test, this test is exactly that stated

in *Blackwell.* We have yet to see any case authority supporting the position taken by the SEC and adopted in Judge Norris' dissent.

We agree with *Blackwell* that whether the transaction can be considered an investment contract depends upon whether the sale and the offering of management services form parts of what is "essentially one transaction." We do not agree that, although Hocking dealt with Dubois and only Dubois, an affiliation between Dubois and HCP, or the Libermans and HCP, should be required in order to determine that Dubois offered an investment contract in what was "essentially one transaction." In fact, any hypothetical arrangement between Dubois and HCP, such as Dubois receiving a commission for each member of the rental pool she signed up, would seem nearly irrelevant to the question of whether the condominium and RPA were presented as "essentially one transaction." Al-

## THE *HOWEY* TEST

### A. Investment of Money

Defendants attempt to pull apart the package into two separate transactions. They argue that even if Hocking did invest money in the condominium, he did not invest money *in the RPA*, and it is the RPA which provides the elements necessary to satisfy the *Howey* test's other requirements. Therefore, they claim, Hocking did not satisfy this first requirement.

Admittedly, there would be an argument as to whether the "investment of money" requirement had been met if someone who already owned a condominium decided to place the condominium into a rental arrangement, independent of the decision to purchase the condominium. If, however, the condominium and rental agreements were offered as a package, there can be no serious argument that Hocking did not invest money in the package. Since Hocking has created an issue of fact over whether the condominium and RPA were sold as a package, he has met this first requirement of *Howey* for purposes of summary judgment.

### B. Common Enterprise

We agree with Judge Reinhardt's discussion for the panel of the Ninth Circuit law on *Howey*'s common enterprise requirement. 839 F.2d at 566–67. The Ninth Circuit accepts either traditional horizontal commonality or, when no pooling among investors is present, a strict version of vertical commonality.

The simple purchase of real estate lacks any horizontal commonality, as no pooling of interests or profits is involved. The purchase of real estate combined with an RPA, however, does evidence horizontal commonality. The participants pool their assets; they give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and they make their collective fortunes dependent on the success of a single common enterprise. Because in this case Hocking has raised facts supporting horizontal commonality, we need not consider vertical commonality.

Of course, whether Hocking can prove horizontal commonality at trial will depend

though the existence of such an arrangement would indirectly support Hocking's argument that Dubois presented the RPA to him, it would have no bearing on whether or not she presented the condominium and RPA as part of the same transaction. Dubois might enter an arrangement with HCP, yet only raise the issue of rental services months after a condominium purchase had been completed. In such a case, the economic benefits to be derived from the managerial efforts of third parties would not have been emphasized in the underlying sale.

Further, we note that defendants did not specifically argue below that a lack of affiliation between Dubois and HCP entitled them to summary judgment. They argued that a lack of any Aetna–HCP or Aetna–Liberman link entitled them to summary judgment. They did not argue the lack of any HCP–Dubois link, or even the lack of any HCP–Liberman link (with Dubois seen as the Liberman's agent). Defendants did argue that the rental agreement "was not offered as part of the sale," ER at 58, but even this argument was put forward as a reason why Hocking did not come within Release 5347, not in reference to the *Howey* test, and this argument was not based on the lack of an HCP–Dubois link. Of course, in his memorandum in opposition, Hocking did not attempt to show any affiliation between HCP and Dubois. If the lack of affiliation between HCP and Dubois

were pivotal, as the SEC claims, Hocking would at least deserve the chance to raise facts which demonstrate such a link.

Lastly, Judge Norris cites *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621 (1975), for the proposition that we should afford the views of the SEC "considerable weight." Ironically, the cited footnote in *Forman* notes that the SEC's position (that *Forman* presented an investment contract) flatly contradicted the SEC's views in then-recent Release 5347, the very release at issue in this case. As the Court pointed out, "[s]everal commentators have noted the inconsistency between the SEC's position in the above release and the decision by the Courts of Appeals in this case, which the SEC now supports." *Id.* (citations omitted). The SEC apparently reversed its position on interpreting this very release in *Forman*, and argued that the securities laws applied even in that extreme case.

Because of the SEC's inconsistent interpretations of Release 5347, and the lack of any case authority supporting its current position, we "accord no special weight to its views. See *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 426 [92 S.Ct. 596, 601, 30 L.Ed.2d 575] (1972); *Blue Chip Stamps v. Manor Drug Stores*, [421 U.S. 723] at 746–47 n. 10 [95 S.Ct. 1917, 1930–31 n. 10, 44 L.Ed.2d 539 1975]." *Forman*, 421 U.S. at 859, n. 25, 95 S.Ct. at 2064.

on whether he can show that Dubois offered a package which included the RPA. As discussed above, Hocking has raised a genuine issue of fact as to that question.

## C. Expectation of Profits Produced by the Efforts of Others

This third prong of *Howey* forms the greatest hurdle for Hocking, assuming he can prove at trial that the condominium and rental agreements were part of one package. He must show an expectation of profits produced by the efforts of others, that the efforts of others are "those essential managerial efforts which affect the failure or success of the enterprise." *Glenn W. Turner Enters.*, 474 F.2d at 482.

The crux of defendants' argument on this point is that the rental agreements allowed Hocking to maintain a high degree of control over his condominium, thus making any managerial efforts of Dubois or HCP non-essential to the success of Hocking's investment.

Hocking was not required to enter into any of the rental agreements as a prerequisite of purchasing the condominium. He elected to delegate control of the condominium to HCP. Further, the rental agreements gave Hocking various termination rights described above, allowing him to regain control over the use and management of his investment.

Defendants point out it was the purchaser's election to delegate control and ability to regain control that led to the conclusion that the third requirement of *Howey* had not been satisfied in *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 915 (8th Cir. 1976). *See also Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir.1978). Both *Fargo Partners* and *Schultz* involved purchasers of entire apartment buildings. The *Schultz* court limited the reach of its holding, noting that "this is not a case where a small investor must rely on the seller's efforts because he lacks business knowledge, finances or control over the operations. Schultz had considerable business experience...." 568 F.2d at 616. The absence of any legal requirement to delegate control in *Fargo Partners* and *Schultz* amounted at the same time to the absence of any practical need to delegate control.

As an inexperienced, non-resident, individual investor Hocking is different from Schultz.

██ Other cases show that the question of an investor's control over his investment is decided in terms of practical as well as legal ability to control. As defendants acknowledge, where the investor maintains legal control over his investment (or the ability to regain control), in order to claim the investment is a security he must show practical dependence, an inability to exercise meaningful powers of control or to find others to manage his investment. *See Gordon v. Terry*, 684 F.2d 736, 742 (11th Cir.1982); *Williamson v. Tucker*, 645 F.2d 404, 424–25 (5th Cir.1981).

*Williamson*, the leading case on the control issue, states that where the investor is a general partner or joint venturer, he must establish that:

> (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

645 F.2d at 424. Of course, under different facts or legal arrangements other factors might give rise to such a dependence on the promoter or manager that exercise of control would be effectively precluded. *Id.* at 424 n. 15.

██ We have previously adopted *Williamson*'s approach. *Deutsch Energy Co. v. Mazur*, 813 F.2d 1567, 1570 (9th Cir. 1987) (finding purchasers of oil well sites for $1.5 million were not "inexperienced and unknowledgeable members of the general public" and therefore were not incapable of exercising management powers over the investment); *Matek v. Murat*, 862 F.2d

720 (9th Cir.1988) (applying *Williamson* test and holding no security alleged, as partnership agreement "provided the plaintiffs with sufficient power to protect their investments," and they "made no showing and are unable to show they were prevented from exercising their powers under the agreement"). *Williamson* simply requires that we examine the economic reality of the investor's relation with the manager or promoter. *See McConnell v. Frank Howard Allen & Co.*, 574 F.Supp. 781 (N.D.Cal. 1983) (applying the *Williamson* test to deny summary judgment on securities claims of general partners in real estate partnership). Therefore, in the absence of any legal obligation to delegate control of his investment, Hocking must establish that his exercise of control was precluded for all practical purposes.

The record presents a material question of fact: was Hocking dependent on Dubois or HCP, and unable to exercise control over his investment? Hocking claims to be an unsophisticated, inexperienced investor, lacking any special training or education. He resides thousands of miles away from the location of the investment. He is not in the business of managing condominiums or other real estate. He has raised a genuine issue of fact whether he requested and received an offer of management services.

Further, Hocking observed that the condominium complex was "operated like a hotel from the lobby," and that HCP distributed brochures and advertisements on the mainland. Affidavit at 3. Numerous other condominium owners participated in the RPA, *id.*, and HCP reserved the right to terminate the RPA if the number of participating units fell below 40 percent of the units in the complex. Supplemental ER at 240. In the RPA agreement, the participating units are referred to as the "Resort." *Id.*

Hocking's affidavit and deposition raise a genuine issue of fact whether he *intended* his investment to be entirely passive, and whether, as alleged, he "relied solely on Dubois to select, manage, and protect" his investment. Complaint at 2–3. This is, however, a different inquiry than whether he lacked the *ability* to manage his investment.

Hocking has not met the first factor suggested in *Williamson*. He has not raised facts showing that his arrangement with Dubois and HCP leaves him so little power as to place him in a position analogous to a limited partner. He certainly exercised more power, at least over his individual unit, than would a limited partner investing in the construction of a similar resort.

Hocking has at least raised questions of fact material to *Williamson*'s second and third suggested factors. With regard to the second factor, he claims to be an unsophisticated and inexperienced investor; he is an individual making a "passive" investment from thousands of miles away. This raises the question whether he is incapable of intelligently exercising his legal powers to manage his condominium.

The third factor suggested in *Williamson* provides the closest fit to an investment in a resort condominium involving an RPA. Hocking's investment is a unit in a resort condominium, allegedly operated as a hotel, with many investors pooling their units together. In order for Hocking to replace HCP, he would have to gain the votes of 75 percent of participating investors. These facts alone create a real question whether Hocking was stuck with HCP as a rental manager. Had Hocking purchased a residential condominium for investment purposes, to be rented out to long-term tenants, then it would have been a relatively easy matter to switch rental agents. Managing a resort operated as a hotel, which solicits guests from the mainland and charges nightly rates for short-term visits, may be a much more difficult service to replace than that of a long-term leasing agent. The commercial viability of a one-room hotel does not strongly argue for separate management. The individual investor may have no choice but to place his condominium in the rental pool, if he is to receive significant rental income.

Because Hocking's pleadings and affidavit raise issues of fact with regard to two factors considered in *Williamson*, we need not consider other factors or approaches that might demonstrate Hocking's practical inability to control his investment. Hock-

ing has at least raised an issue of fact as to his ability to manage the investment, and as to the uniqueness of HCP's RPA as a method of producing income from the condominium.

Defendants also protest that Hocking's deposition statements prove his intent was to resell the condominium quickly for a profit, and that he therefore could not have depended on rental income from the RPA for his profits, or expected profits from the efforts of the rental pool operator. Even in this regard, Hocking indicated he merely planned to sell "when [Dubois] instructed [him] it was the best time to sell." Further, in his affidavit Hocking testifies that the rental arrangement was a necessary element of the transaction, that he had expected the rental income to cover his monthly payment, and that the failure to receive the rental income resulted in the loss of his investment. Placed in this light, Hocking's deposition statements concerning a possible quick resale do not eliminate the question of fact concerning the third prong of *Howey*—whether Hocking expected profits from the efforts of others to carry the investment until he could sell it. The deposition statements that Hocking intended to resell quickly merely provide the type of conflicting evidence that a trial is designed to resolve.

## CONCLUSION

■ We agree with defendants and amici that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security. Such a per se rule would be ill-suited to the examination of the economic reality of each transaction required by *Howey*. In the context of isolated resales, each case requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment

and the collateral agreements. The investor's intentions and expectations as communicated to the broker would be relevant in determining what investment package was actually offered.

If the *Howey* analysis is undertaken, the securities laws are found to apply, and the application of the securities laws places undue burdens on developers, real estate brokers, or condominium owners, changes in the law should be sought from Congress or the Securities and Exchange Commission. *Howey*, on this record, requires this case to proceed beyond summary judgment.

REVERSED AND REMANDED.[8]

WILLIAM A. NORRIS, Circuit Judge, joined by Judges WIGGINS, BRUNETTI, O'SCANNLAIN and TROTT, dissenting:

This case involves the resale of a condominium apartment in a resort complex in Hawaii. The developer of the complex had offered the original condominium purchasers the opportunity to participate in a rental pool arrangement (RPA) run by Hotel Corporation of the Pacific (HCP). In an RPA, an agent is responsible for renting and managing all apartments that participate in the pool, and each owner receives a pro rata share of the rental income. It is not disputed that a sale of a condominium by a developer who also provides an RPA normally constitutes the sale of a security.

Here the resellers of the condominium, the Libermans, had elected not to participate in the RPA when they purchased their condominium from the developer. In reselling the condominium, the Libermans' real estate agent, Dubois, informed the prospective buyer, Hocking, that the RPA was available should he wish to participate as a condominium owner. After buying the Libermans' condominium, Hocking in fact became a participant in the RPA managed by

---

**8.** Appellees allege Hocking's en banc brief misstates the facts so egregiously that sanctions are required. Although Hocking's statement includes fewer citations to the record than Fed.R. App.P. 28(a)(3) and Ninth Cir.R. 28–2.8 require, and is, in some respects incomplete, it is sufficiently "well grounded in fact" that Rule 11

sanctions are not warranted. *See Unioil, Inc. v. E.F. Hutton & Co., Inc.,* 809 F.2d 548, 556–59 (9th Cir.1986).

Appellees also seek fees under § 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e). Since appellees have not prevailed, fees are not warranted.

HCP. Hocking has not alleged or proffered evidence that Dubois had any affiliation or selling arrangement with HCP, or that Hocking was led to believe that she did.

The sole question presented by this appeal is whether these facts give rise to a genuine issue for trial as to whether the sale of the Libermans' condominium to Hocking constituted the sale of a security that is regulated by the federal securities laws. My view that it does not is based largely on the reasoning of the SEC in its *amicus* brief.

I agree with the SEC that in the absence of probative evidence of some affiliation or selling arrangement between the Libermans (or their agent Dubois) and the manager of the rental pool, the condominium sale did not involve the sale of a security because Hocking's contract to participate in the rental pool was a separate transaction. *See* Brief of *Amicus Curiae* SEC, at 3. I fear that the breadth of the majority opinion and the paucity of any probative evidence that Dubois did anything more than inform Hocking of the availability and economics of the rental pool will spawn litigation under the federal securities laws whenever a similar buyer becomes disappointed with the economic return he realizes from his condominium and RPA. Hocking, as a disappointed investor in a condominium and an RPA, is indistinguishable from thousands of others. The fact that his investment did not live up to his expectations does not, without more, mean that he can sue the real estate agent for violation of the federal securities laws. Judge Hug put it succinctly in his dissent from the original panel decision when he said that "a broker who simply arranges for the sale of the unit and notifies the buyer that he may be able to enroll in the developer's rental pool is not offering a security. This is a real estate transaction

and is properly governed by real estate law." *Hocking v. Dubois*, 839 F.2d 560, 571 (9th Cir.1988).

## I

### A

Although the sale of real estate ordinarily does not involve an "investment contract" for purposes of the federal securities laws,[9] courts have held that the sale of real estate will constitute the sale of a security when related management services are provided either by the real estate promoter or by someone having an affiliation or selling arrangement with the promoter. *See, e.g., SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (promoter sells land with service contract for cultivation of oranges; promoter of land and manager of orange groves were under "direct common control" of one another); *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187 (5th Cir.1979) (promoter sells condominium campsites, and retains exclusive right to rent campsites in owner's absence and to share profits with owner); *Wooldridge Homes v. Bronze Tree*, 558 F.Supp. 1085 (D.Colo.1983) (promoter sells unimproved resort property and promises to build condominiums and arrange for management services for two years); *Hodges v. H & R Investments*, 668 F.Supp. 545 (N.D.Miss.1987) (promoter of condominium guarantees buyer minimum rental income and promises to pay referral fee to buyer).

A requirement of an affiliation or selling arrangement between the promoter of property and the provider of management services stems from the nature of an investment contract. An investment contract requires both an investment of money and an expectation of profits from the efforts of others. *See Howey*, 328 U.S. at

---

**9.** Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10), both define "security" as including an "investment contract." The leading case on the meaning of "investment contract" is *Howey*, which defined the term as "a contract, transaction or scheme whereby a person (1) invests his money (2) in a common enterprise and (3) is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–99, 66 S.Ct. at 1102–03. *See also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) (definition of investment requires "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others").

298–99, 66 S.Ct. at 1102–03. An investment of money in the purchase of a condominium is not, in itself, a securities transaction; nor does it become one when the purchaser independently procures management services from others. As the SEC puts it, "[u]nless there is a link between the seller of the property (or his agent) and the provider of services, these are two separate transactions, and the property sale is not covered by the securities laws." Brief of *Amicus Curiae* SEC at 10–11.

The SEC's view that Dubois' sale of the Libermans' condominium did not involve the sale of a security is consistent with the position taken by the SEC in Release 5347. The Release notes that "[t]he offer of real estate as such, without any collateral arrangements with the seller or others, does not involve the offer of a security." 1 Fed.Sec.L.Rep. (CCH) ¶ 1049, at 2071. However, the release states, "[w]hen the real estate is offered in conjunction with certain services, a security, in the form of an investment contract, may be present." *Id.* One such service noted in the release is an RPA. *Id.* at 2072. The release makes clear that the investment contract test is satisfied where the condominium sale is "coupled with" the RPA. *Id.* at 2070. Where the condominium seller (or his agent) and the RPA operator have no affiliation or selling arrangement, there is no such "coupling." The SEC informs us that this has long been its position in its enforcement policy under the securities laws:

> The release does not apply to persons who resell their own individual units ... and have no affiliation or selling arrangement with the pool operator.

> The Commission's staff has expressed that understanding of the release on numerous occasions. Subsequent to the issuance of the Commission's release, persons involved in developing real estate projects have frequently sought the informal advice of the Commission's Division of Corporation Finance as to whether the Division would recommend Commission enforcement action if the proper-

ty were sold without complying with the registration provisions of the Securities Act. The Division has declined to take a "no-action" position where there is an affiliation or selling arrangement between the developer [i.e. seller] and the rental pool operator. Where, however, no such affiliation or selling arrangement is present, the Division has taken a no-action position.

Brief of *Amicus Curiae* SEC at 13–14.

In my view, the SEC's position is a sound and principled attempt at drawing the line between those sales of residential real estate that involve an investment contract and those that do not. The SEC's position sensibly limits the reach of the federal securities laws by excluding sales of individual condominium units where the seller (or his agent) has no connection with anyone who provides management services, while at the same time including cases in which the seller is affiliated with a provider of management services. As a hypothetical illustration, suppose the seller in this case had been the developer of the resort complex and had operated an RPA for condominium owners who wished to participate. Suppose further that Dubois had been a real estate agent who had an arrangement with the developer to sell units on commission and that Dubois hyped the developer's RPA as part of her sales pitch. In this hypothetical, the commission agreement between Dubois and the developer could satisfy the SEC's proposed requirement of a link between the seller of the property (or his agent) and the provider of investment services. Note that this result would obtain whether or not Dubois had authority to offer participations in the developer's RPA to prospective buyers of the condominiums.[10]

In the actual case before us, however, there is no evidence that the Libermans or their agent Dubois had any connection whatsoever with HCP, the operator of the RPA. As the SEC puts it, "Since in this case there is no suggestion of any affiliation or selling arrangement between the

---

**10.** In this respect I agree with the majority that "legal authority" to offer the security is not required for an offering to take place within the

meaning of the securities laws. See Majority Opinion at 1457.

sellers of the condominium (or the real estate agent) and the operator of the rental pool, the sale of the condominium was not a transaction that involved an investment contract." Brief of *Amicus Curiae* SEC at 11. On this important and technical issue involving the applicability of the securities laws to real estate transactions, I believe we should afford the views of the agency charged by Congress with the responsibility for administering those laws "great weight." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 2063 n. 25, 44 L.Ed.2d 621 (1975).[11]

## B

The majority fails to afford any deference to the views of the SEC. Indeed the majority does not even discuss the SEC's position that in the absence of a link between Dubois and HCP, we should not hold that Dubois offered Hocking a security in the form of a participation in HCP's rental pool. Instead, the majority simply adopts its own test as to what constitutes the offering of a security in the context of a condominium sale and a rental pool agreement: "It is enough if the [condominium and RPA participation] *were presented to Hocking as part of the same transaction*

*or scheme,* and that he purchased them as such." Majority Opinion at 1458 (emphasis added). In my view, this test is much too imprecise to serve as a meaningful standard for determining when a realtor's discussion of an available RPA transforms a condominium sale into a sale of a security. For aught I can tell, under the majority's standard a sale of a condominium may be converted into a securities transaction anytime a real estate agent informs the buyer about an available RPA. The majority's test is so standardless that unwary realtors who do nothing more than advise prospective condominium purchasers about the availability and economics of an RPA will find themselves in federal court defending actions brought under the federal securities laws on the authority of the decision in this case.[12]

The majority protests that

Hocking has put forward numerous facts concerning whether the condominium sale and rental agreements were presented to him as parts of one transaction.... [which] distinguish this case from the everyday situation where a real estate agent or broker merely provides information to the purchaser regarding the availability of a rental pool or shared amenities such as a swimming pool or tennis courts.

11. The majority contends that *Forman* does not require us to defer to the SEC's views in this case, because the Court there held that deference is inappropriate when the SEC reverses its position without explanation. In this respect, however, *Forman* is clearly distinguishable from today's case. In *Forman,* the issue was whether the purchase of cooperative apartment units was an investment contract, where the purchasers were buying the units to live in and were not seeking to "receiv[e] profits from the efforts of others." 421 U.S. at 858, 95 S.Ct. at 2063. In its brief *amicus curiae,* the SEC argued that the sale was an investment contract. The Supreme Court noted, however, that the SEC's argument contradicted its position in Release 5347, which had said that the securities laws cover only those real estate transactions in which the real estate is "offered and sold with emphasis on the managerial efforts" of others. 421 U.S. at 858 n. 25, 95 S.Ct. at 2063 n. 25 (quoting Release 5347, 38 Fed.Reg. 1735, 1736 (Jan. 18, 1973). In the Court's view, the SEC's new position—which seemed to abandon the requirement of "profits from the efforts of others"—represented an

"unexplained contradiction" of its previous position.

By contrast, the SEC's position in the current case is entirely consistent with Release 5347. The SEC is attempting to rein in the expansive interpretation of Release 5347 by insisting that it does not apply to brokers in the secondary condominium market who have no affiliation with persons selling investment services. The majority notes that the SEC's interpretation of Release 5347 is "not readily apparent from the language of the release." Majority opinion at 1457. Perhaps not, but nothing in the release ever remotely suggested that brokers lacking any connection with the seller of management services were subject to the securities laws. The SEC's position is entirely consistent with the Release and with common sense. Because the SEC is not contradicting itself as it was in *Forman,* I believe its views are entitled to deference.

12. The National Association of Realtors is legitimately concerned about this peril to its industry. *See* Brief *Amicus Curiae* of the National Association of Realtors, at 5.

Majority Opinion at 1458. In my view, this gossamer distinction between "merely provid[ing] information" and "present[ing] as part of the same transaction" is no distinction at all. I can find nothing in either the majority's analysis or the "numerous facts" put forward by Hocking that indicates where the line is to be drawn, or what it is about the present case that places it on one side of the line rather than the other. As I read the opinion, the majority does not require any evidence of facts that would distinguish this case from the garden-variety transactions that the majority asserts its standard will not reach. Rather, the majority relies on the unexceptional facts that Dubois provided Hocking with information about the RPA and that she obtained the RPA forms for him. *See id.* at 1457–58. The majority also apparently relies on Hocking's assertion "that without the rental agreements, he would not have entered into the transaction," *id.*, although I fail to see the relevance of *Hocking*'s subjective state of mind to the question whether *Dubois* offered a security.

In sum, while a jury could doubtless infer from the evidence cited by the majority that the condominium and RPA "were presented to Hocking as part of the same transaction," I can see no reason why a similar inference could not be drawn in *any* case in which a broker "merely provide[d] information to the purchaser regarding the availability of a rental pool," *id.* at 1458.[13] The majority asserts that the two situations are different, but fails to provide any principled basis for making the distinction. Because of this absence of a limiting principle, I fear that the majority's test will prove to be nothing but a recipe for indiscriminate use of the federal securities laws against real estate agents involved in the sale of condominiums.

I know of no precedent for the majority's "presented as part of the same transaction" test for determining when the purchase of a condominium and a participation in a rental pool may be coupled for purposes of the federal securities laws. In the real estate cases cited by the majority there was in fact a link between the seller of the real estate and the manager of related investment services,[14] just as the SEC urges there must be. As I noted above, had Dubois been affiliated with HCP and used HCP's rental pool as an inducement to persuade Hocking to buy the condominium, the securities laws might well have covered the transaction. *See supra* page 1465. But it is undisputed that Dubois had no such affiliation, and the majority offers absolutely no authority—and, indeed, no explanation—for its conclusion that a realtor is subject to the federal securities laws in the absence of an affiliation or selling arrangement with a seller of investment services. The cases cited by the majority for the proposition that the term "offer" has a broader meaning in securities law than in contract law are merely authority for the undisputed proposition that a realtor need not be "legally authorized" to offer an investment contract as part of a real estate transaction to convert it into a sale of a security.[15] They are not authority for the proposition that a condominium sale may be a security transaction in the absence of a link between the seller and the provider of investment services.

Nor is *Blackwell v. Bentsen,* 203 F.2d 690 (5th Cir.), *cert. dismissed,* 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954), authority for the majority's standard. *Blackwell* involved the purchase of citrus groves and harvesting services. Although the real estate and the management services were sold by different companies, the two com-

---

**13.** Dubois' assistance in obtaining the RPA forms for Hocking is surely too inconsequential to create a meaningful difference between this case and any other case in which a real estate agent merely provides information to a prospective purchaser.

**14.** *See, e.g., Howey,* 328 U.S. at 296, 66 S.Ct. at 1101; *Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036 (10th Cir.1980).

**15.** Moreover, in the cases cited by the majority, the offeror was affiliated with the seller of investment services. *See Diskin v. Lomasney & Co.,* 452 F.2d 871, 875 (2d Cir.1971) (stock prospectus circulated by stockbroker); *SEC v. Commercial Inv. & Dev. Corp. of Florida,* 373 F.Supp. 1153, 1164–65 (S.D.Fla.1974) ("newsletter" issued by investment company).

panies were owned and operated by the same people. The Fifth Circuit held that, because the land and services were sold as "essentially one transaction," the entire sale was covered by the securities laws. The majority claims that *Blackwell*'s "essentially one transaction" language supports the majority's "presented as the same transaction" standard, but it obviously does nothing of the sort. In *Blackwell* there was a clear affiliation between the seller of real estate and the seller of management services, whereas in this case there was none. The majority overlooks this distinction as though it were a mere incidental fact, when it is critical.

## II

This case is before us on an appeal from summary judgment in favor of Dubois. In order to defeat summary judgment, Hocking must produce evidence that would permit a jury to find, by a preponderance of the evidence, the facts necessary to sustain his claim that Dubois offered him a security. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("The judge's inquiry ... asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."). If the evidence in the record "is such that it 'would require a directed verdict'" against Hocking, then there is no issue of fact for trial and summary judgment is appropriate. *Id.* at 250. In order to meet his burden of raising material issues of fact, Hocking must adduce evidence that is "significantly probative" of his claim. *First Nat'l Bank v. Cities Service,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *ALW, Inc. v. United Air Lines, Inc.,* 510 F.2d 52, 55 (9th Cir.1975). The evidence must be more than a "mere scintilla." *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

In my view, the evidence before us, even when interpreted in the light most favorable to Hocking, proves no more than the following facts: In the course of selling Hocking the Libermans' condominium, Dubois advised Hocking about the availability and economics of HCP's rental pool arrangement, and discussed the investment potential of a combination of the appreciation on the condominium and the cash flow from the RPA. She assisted Hocking in preparing an application to HCP for a participating interest in the RPA, and offered to help him resell the condominium at some time in the future.

These facts, if true, fail to distinguish this transaction in any principled way from any other sale of a resort condominium that involves a discussion between the sales agent and the buyer about the availability and economics of an RPA. Surely the federal securities laws were never intended to discourage realtors from performing their important function of providing prospective buyers with as much relevant information as possible to help them make informed judgments about the property they are considering. It was obviously important to Hocking to know about HCP's rental pool and its economic potential. It was natural for him to want the benefit of his realtor's knowledge and advice on the subject. Giving advice on the investment potential of a security cannot properly be equated with offering a security. Yet the majority's "presented as part of the same transaction or scheme" test is so broad and imprecise that it could readily be interpreted as encompassing virtually any condominium sale involving a discussion between the realtor and the buyer about an RPA.

The majority cites Hocking's deposition testimony that Dubois told him that "the investment would be handled by a local company, or her company or someone that she would help [him] get in touch with." Hocking deposition, Record on Appeal ("ROA") at 64, quoted in Majority Opinion at 1452. In my view, this snippet of testimony has no significant probative value. It is so equivocal that it is hard to tell what material fact, if any, the testimony tends to prove. Nor does the majority enlighten us as to the probative value of the testimony under its "presented as part of the same transaction or scheme" standard. In context, the testimony cannot possibly mean

that Hocking was saying that he expected anyone other than HCP to be responsible for the management of the RPA.[16] The testimony indicates only that Dubois promised that she would assist Hocking in the purchase and resale of the condominium, and that this assistance would include helping him apply to HCP for an RPA participation.[17] If Hocking intended to try to prove by this scintilla of evidence that Dubois or her employer Vitousek & Dick had an affiliation with HCP or its rental pool, he could easily have submitted a clarifying affidavit to that effect in opposition to Dubois' motion for summary judgment. On the record before us, however, I fail to see how this excerpt of his deposition testimony is probative of anything beyond a routine sale of a resort condominium.

In sum, if Dubois' sale of the Libermans' condominium is swept under the majority's "presented as part of the same transaction or scheme" standard, then I think the standard is so all-encompassing that any realtor would be well-advised to steer clear of the subject of rental pools in the course of selling condominiums. Such a result, I believe, is counterproductive and fails to serve any of the purposes of the federal securities laws. I would affirm the summary judgment for the defendants.

WIGGINS, Circuit Judge, joined by Judge TROTT, dissenting:

Stated precisely, the issue in this case is whether a real estate broker can be held liable under the federal securities laws for marketing a condominium apartment whose buyer is entitled, but not obligated, to join a rental pool offered and managed by a party not affiliated with the seller. The majority believes that if the real estate broker markets the condominium apartment and rental pool as a "single package," even if the parties offering them are unaffiliated, then the investment possibly amounts to the purchase of a "security" as defined in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Maj. op. at 1456–58. The majority is thus unwilling to grant summary judgment in favor of Dubois, believing that Hocking has raised material issues of fact regarding whether the condominium apartment and rental pool were marketed as a package and whether the sale involved an investment of money in a common enterprise with an expectation of profits produced by the efforts of others. *Ante* at 1458–1461.

Unlike the majority, I believe that holding a real estate broker liable for the sale of an individual condominium apartment strays too far from the dominating purpose of the Securities Act of 1933 and the Securities Exchange Act of 1934: "to regulate

---

**16.** In his testimony, Hocking stated unequivocally that he understood that HCP was responsible for managing the RPA:

> I knew and relied upon the fact that approximately fifty other condominium owners participated in the pooling arrangement of which I was a part. The monthly statements which I received from *the company operating the pooling arrangement* indicated that I was receiving approximately 2% of the total rental income from the building each month. When I visited my condominium, I observed that the building in which it was located was operated like a *hotel from the lobby*, and I received copies of the brochures and advertisements which *the pooling company* distributed to the mainland. I relinquished control of the condominium *to the pooling company* right at the time I purchased it and only had access to it for not more than two weeks per year.

Hocking affidavit ¶ 6, ROA at 93.

**17.** It is instructive to read Hocking's testimony immediately preceding the excerpt quoted by the majority:

> [Hocking:] That was my purpose in investing in Hawaii, to be a first-person buyer and, shortly after it topped off, to then turn it around and sell it.
> ....
> [Question:] You said as soon as it was topped off, you would turn around and sell it. What do you mean by that?
> [Hocking:] I was informed by my real estate agent, Miss Dubois, that the way to invest in Hawaii was to buy an investment in a condominium or something along that line before the building is finished and then, when the building is finished, the property will have appreciated.
> Shortly thereafter, it has appreciated to the greatest extent. *We would then turn around and sell it. There was no worry about coming up with more money because the investment would be handled by a local company or her company or someone that she would help me get in touch with.*

Hocking Deposition, ROA at 64 (emphasis added).

the schemes devised by those who seek the *use* of the money of others with the lure of profits." Note, *Federal Securities Registration of Condominiums: A Purchaser's Perspective*, 62 Geo.L.J. 1403, 1405 (1974) (emphasis added); *see United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) (focus of the Acts is on the unregulated "sale of securities to raise capital for profit-making purposes"); *SEC v. W.J. Howey Co.*, 328 U.S. at 299, 66 S.Ct. at 1103 (purpose of the Acts is to regulate the conduct of those "who seek the use of the money of others on the promise of profits"). Individual sellers of condominiums do not attract purchasers in order to put their money to "use"; they are instead selling them a tangible asset. In my view, therefore, the Acts reach only the rental pool operator's offering of collateral agreements that induce condominium owners to forego the personal use of their apartment on the promise of profits to be derived from a common enterprise in which they lack any effective control. The essential factor of a collateral agreement is absent anytime an individual owner sells his condominium without authority to bind the rental pool operator, exactly the situation here. For that reason, I respectfully dissent.

I

A

"[W]hen a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or develop it themselves,' as the *Howey* Court put it—the securities laws do not apply." *Forman*, 421 U.S. at 852–53, 95 S.Ct. at 2060–61 (citation omitted). Accordingly, condominium apartments purchased for the purpose of occupying them as a residence do not involve investment contracts. Nor is this conclusion obviated simply because the property owner anticipates a normal appreciation in the value of the property and would not have consummated the purchase absent that expectation. *See Joyce v. Ritchie Tower Properties*, 417 F.Supp. 53, 54–

55 (N.D.Ill.1976) ("the sale of a condominium unit to be occupied by the plaintiff as his residence," even though he was expecting its appreciation in value, did not involve the sale of a security). The logic of this conclusion is irrefutable: "A piece of real estate, such as a condominium, has an inherent worth," and its appreciation depends more on economic variables than it does "on the efforts of a promoter." *Bender v. Continental Towers Ltd. Partnership*, 632 F.Supp. 497, 501 (S.D.N.Y.1986); *accord Dumbarton Condominium Ass'n v. 3120 R Street Assoc. Ltd. Partnership*, 657 F.Supp. 226, 230 (D.D.C.1987); *Mosher v. Southridge Assocs., Inc.*, 552 F.Supp. 1231, 1232 (W.D.Penn.1982); *Johnson v. Nationwide Indus., Inc.*, 450 F.Supp. 948, 953 (N.D.Ill.1978).

But a far more troubling situation arises where, as here, an investor purchases a condominium apartment expecting its appreciation in value and using it only intermittently as a vacation home, and yet finances the investment through rental income derived from the efforts of others. This type of transaction possesses some qualities of an investment whose success depends on the efforts of others, but it equally possesses qualities of an investment whose success depends on economic variables well beyond the control of the promoter. Like other real estate investments, the arrangement could fail if the anticipated appreciation is not ultimately realized; equally true, the arrangement could collapse if the rental proceeds are insufficient to sustain the finance costs of the initial purchase. Logically, the federal securities laws ought to afford a measure of protection to investors who are misled by false projections of rental income, *see* Rosenbaum, *The Resort Condominium and the Federal Securities Laws—A Case Study in Governmental Inflexibility*, 60 Va.L.Rev. 785, 796 (1974) ("purchasers should be furnished information bearing on [a promoter's] competence in operating resort rental facilities"), but not for investors who are disappointed because economic variables [18] fail to yield an expected appre-

---

**18.** Distinguishable, of course, are those cases holding that an investment contract exists when the appreciation in the value of the real estate is

derived from the efforts of a developer rather than ordinary economic factors. *See, Aldrich v.*

ciation in the value of the condominium, *see Bender*, 632 F.Supp. at 501.

### B

The Securities and Exchange Commission ("Commission") has itself struggled for many years with the mechanics of this type of transaction, offering in 1973 the following guidelines as a solution:

> In summary, the offering of condominium units in conjunction with any one of the following will cause the offering to be viewed as an offering of securities in the form of investment contracts:
>
> 1. The condominiums, with any rental arrangement or other similar service, are offered and sold with emphasis on the economic benefits to the purchaser to be derived from the managerial efforts of the promoter, or a third party designated or arranged for by the promoter, from rental of the units.
>
> 2. The offering of participation in a rental pool arrangement; and
>
> 3. The offering of a rental or similar arrangement whereby the purchaser must hold his unit available for rental for any part of the year, must use an exclusive rental agent or is otherwise materially restricted in his occupancy or rental of his unit.

Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in Real Estate Development, Securities Act Release No. 33–5347, [1972–1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,163, at 83,539–40 (Jan. 4, 1973) (hereinafter "Release No. 33–5347"). Each of these types of real estate transactions, according to the release, involve investments with business emphasis and therefore are appropriately the subject of the federal securities laws. *But see* Note, *The Economic Realities of Condominium Regulation Under the Securities Act of 1933*, 19 Ga.L.Rev. 747 (1985) (stressing that the guidelines should

be revised because they unduly stress promoters' profit motives in attracting purchasers rather than the economic reality of the condominium owner's retained control over the rental arrangements for his apartment).

In its *amicus curiae* brief, the Commission takes the position that the views expressed in its release apply only to persons engaged in the business of building and selling condominium apartments. Further, the Commission argues that, although unstated in the release, the sale of an individual condominium apartment cannot constitute the sale of a security, even if the buyer anticipated enrollment in a rental pool, absent an affiliation between the condominium seller and the rental pool operator. The majority dismisses this view merely as an interpretation of the Commission's 1973 release. Maj. op. at 1456. That release, however, represents the Commission's interpretation of the federal securities Acts and is, therefore, to be accorded "great weight"; the Commission's interpretation of its own release is, in my view, entitled to equal deference. *Cf. Forman*, 421 U.S. at 858 n. 25, 95 S.Ct. at 2063 n. 25.

The majority dismisses the Commission's view nonetheless, perceiving it as an attempt to "pull apart the package into separate transactions," neither of which, according to the logic of the majority's argument, could alone constitute the sale of an investment contract. Maj. op. at 1456–57. This view, however, unknowingly adopts the Commission's previously stated conclusion that, "where an investment contract is present, it consists of the agreement offered and the condominium itself." Release No. 33–5347, at 82,536 n. 1. But as one commentator has aptly observed, this conclusion implies, illogically, that a condominium owner who joins a rental pool sometime after the initial purchase thereby invests in a security consisting of both the condominium apartment and the rental pool agreement. *See* Rosenbaum, 60 Va.L.Rev. at 791. For example, had the Libermans

---

*McColloch Properties, Inc.*, 627 F.2d 1036, 1039 n. 1 (10th Cir.1980) ("Capital appreciation through development should be distinguished from a general increase in land values concurrent with neighborhood growth and improvements"); *cf. SEC v. C.M. Joiner Leasing Corp.*,

320 U.S. 344, 349, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943) (the capital appreciation in investors' leases depended on a promoter's efforts in drilling a test oil well). *See generally* 1 L. Loss, *Securities Regulation* 491–92 (2d ed. 1961).

enrolled in the rental pool rather than place their condominium on the real estate market, the Commission, and presumably the majority, would assert that they had invested in a "security" consisting of both the condominium and the rental agreement. The problem with this theory, of course, is that the condominium apartment, already belonging to the Libermans, is not what they would have "received" in return for their investment. Quite the contrary, use of the condominium apartment is what they would have "given up" in exchange for the opportunity to profit from the rental pool.

The better interpretation, the only one that makes logical sense given the Commission's position in its *amicus curiae* brief, is that the "investment contract" consists only of the rental agreement itself and not of the condominium apartment and the rental agreement combined. The same is true regardless of whether the condominium apartment and the rental agreement are marketed, in the words of the majority, as a "single package," or whether they are marketed separately. Thus, the initial purchase of the condominium apartment, even if the buyer anticipates enrollment in a rental pool, does not implicate the federal securities laws. Once the buyer commits the use of the condominium apartment to the rental pool, however, that act constitutes an exchange of value that satisfies the first prong of the *Howey* test. *See International Bhd. of Teamsters v. Daniel,* 439 U.S. 551, 560 n. 12, 99 S.Ct. 790, 797 n. 12, 58 L.Ed.2d 808 (1979) ("This is not to say that a person's 'investment,' in order to meet the definition of an investment contract, must take the form of cash only, rather than of goods and services."); *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976) ("an 'investment of money' means only that the investor must commit his assets to the enterprise in such a manner as to subject himself to financial loss"). Whether the second and third prongs of the *Howey* analysis are satisfied would, of course, depend on the type of rental agreement involved and the amount of control retained by the condominium apartment owner. *E.g., Cameron v. Outdoor Resorts*

*of Am., Inc.,* 608 F.2d 187, 191–92 (5th Cir.1979) (holding an investment contract where a promoter was given "the exclusive right to rent the [condominium] campsite in the absence of the owner and his guests"), *aff'd on reh'g,* 611 F.2d 105 (5th Cir.1980); *see* Note, 19 Ga.L.Rev. at 772–75 (economic realities of investment contracts depend on the type of rental agreement and the amount of control retained by the condominium owner).

This conclusion is fully consistent with the Supreme Court's decision in *Howey.* There, investors anticipated profits to be earned by the marketing of citrus products grown on their property. According to the Court, "[t]he resulting transfer of rights in land [was] purely incidental," even inconsequential, in the sense that the real estate was considered a component of the investment contract. 328 U.S. at 300, 66 S.Ct. at 1103. But the investors' foregoing of the use of their land, purchased only coincidentally from the same promoter, was critical to the exchange of value needed to enter the service contract. In other words, the "investment of money" needed for the first prong of the *Howey* test was not satisfied by paying the cost of the real estate and service contracts considered together, but rather by foregoing the use of an asset in order to commit it to the use of another on the promise of profits. *See id.* at 300–01, 66 S.Ct. at 1103–04.

### C

As this case well demonstrates, absurd results attach to any other interpretation. If the condominium apartment is itself considered a component of the investment contract, its seller could be held liable for representations regarding its resale value even though that value has nothing to do with the "efforts of others." No justification exists for a resort condominium owner to have a federal remedy for losses of this sort while residential condominium owners are deprived of a similar remedy. State laws may offer protection for losses of this sort; the federal securities laws are not so designed.[19]

---

**19.** I find it appropriate at this juncture to repeat the admonition of the Supreme Court:

It has been suggested that the sale of housing developments such as condominiums and

Moreover, the effect of concluding that a condominium apartment is a component of the investment contract is that neither real estate brokers who are unlicensed in the sale of securities nor securities brokers who are unlicensed in the sale of real estate can market the sale of an individual condominium apartment whose buyer is entitled to join a rental pool. *See* Rosenbaum, 60 Va.L.Rev. at 797–98. The individual owner, under these circumstances, will either have to market the unit himself, thereby defeating the stated purpose of promoting complete disclosure to potential buyers, or seek that elusive broker who is appropriately, yet needlessly, licensed in both fields. *See id.* at 801–02. Such a rule is, frankly, utter nonsense. *See generally* Berman & Stone, *Federal Securities Laws and the Sale of Condominiums, Houses, & Homesites,* 30 Bus.Law. 411, 412 (1975) (warning developers to "be prepared to deal with a misapplication of the securities acts to the conventional offer and sale of real estate units"); Comment, *Looking Through Form to Substance: Are Montana Resort Condominiums "Securities"?,* 35 Mont.L.Rev. 265 (1974) (emphasizing that the real estate transactions involved in the sale of resort condominiums is adequately protected by state laws and that compliance with securities regulations is either redundant or pointless).

Conversely, requiring promoters of rental pools to comply with the requirements of the federal securities acts, regardless of whether the target of their offering acquires the condominium directly from them or from previous owners, serves the legitimate purpose of regulating the conduct of those "who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey,* 328 U.S. at 299, 66 S.Ct. at 1103; *see* Note, 62 Geo.L.J. at 1413–28

(suggesting types of information that ought to be given to potential investors in rental pools). Equally important, placing the burden of compliance with the securities regulations on the promoter of the rental pool avoids the problem that real estate agents will otherwise encounter if they help prospective condominium purchasers obtain financing. *See* Rosenbaum, 60 Va.L.Rev. at 804–15. It may well be that investors will not consummate the purchase of condominium apartments without being told of the opportunity to join a rental pool. But the burden of disclosing the expected financial benefits of the rental pool is placed appropriately on its promoter and not on the individual condominium seller. Even the least sophisticated buyer would recognize that information provided by an individual condominium seller has no greater value than any other "stock tip" provided by one investor to another.

### D

In summary, I believe that an investor may have recourse in the federal securities laws only for losses he sustains after committing his condominium apartment to a rental pool whose promoter has not fully disclosed its financial advantages and disadvantages. That loss may, in appropriate circumstances, include the costs of financing the initial investment in the condominium. But I also believe that an investor cannot recover for these losses against the condominium seller or the seller's agent, nor can he recover under federal law for losses caused by an inadequate appreciation in the value of the condominium. Until Congress passes legislation otherwise, any remedy provided to condominium buyers against these parties or for this type of loss is, appropriately, a matter of state law.

cooperatives is in need of federal regulation and therefore the securities laws should be construed or amended to reach these transactions. Others have disagreed, claiming that the extensive body of regulation developed over more than four decades under these Acts would be inappropriate and unduly costly to the sellers and buyers of residential housing. Moreover, extension of the securities laws to real estate transactions would involve important questions as to the appropriate balance between state and federal responsibility. The determination of whether and in what manner federal regulation may be required for housing transactions, where the characteristics of an investment in securities are not present, is better left to Congress, which can assess both the costs and benefits of any such regulation.
*Forman,* 421 U.S. at 859 n. 26, 95 S.Ct. at 2064 n. 26 (citations omitted).

## II

If the law and facts in this case are as I perceive them, Hocking cannot recover against Dubois for two reasons. First, Hocking's claim is lodged against the wrong party—at least to the extent that he claims his profits from the rental pool failed to sustain, as allegedly promised, the costs of financing his condominium apartment. It is undisputed that Dubois, as the Libermans' real estate agent, lacked any authority to offer Hocking a rental agreement on behalf of the Hotel Corporation of the Pacific, Inc. ("HCP")—the promoter of the rental pool. Indeed, the record reveals that Hocking entered into the rental agreement directly with HCP sometime after purchasing the condominium. There is, therefore, no basis for holding that Dubois either had the capacity to, or in fact did, "offer" Hocking an investment contract. The party who made that offer, HCP, simply has not been named in this lawsuit.

Second, Hocking's theory of liability lies, for the most part, on the fact that the condominium apartment failed to appreciate in value as allegedly promised. Hocking does not deny that his entire motive in investing in this condominium apartment was to profit from its expected appreciation. Nor can he seriously deny that he was able to make his monthly payments on the condominium apartment—at least in part from the proceeds of the rental pool—up until the point that the "balloon" payment became due. The crux of his complaint, then, is that the condominium apartment was not sold before that time because it failed to appreciate in value as he had predicted. This claim is undoubtedly a matter of state law.

Dubois is entitled to summary judgment for both of these reasons. Accordingly, I would affirm the judgment of the district court.